*Cm*

# **13-0315TJS** *thru* **13-0317TJS**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your affiant, Brandon Ridenhour, being first duly sworn, deposes and states as follows:

1.     I am a Special Agent in the Federal Bureau of Investigation (FBI). I am currently assigned to the Baltimore Division's Rockville Resident Agency where I am responsible for the investigation of, among other things, criminal offenses involving national security. I have over three years of experience with the FBI as a Special Agent working criminal offenses that involve national security.

2.     This affidavit is submitted in support of an application for a search warrant for each of the following associated with ZHANG MingJie, a/k/a ZHANG Ming jie, a/k/a Mingjie ZHANG, who is a Chinese national and naturalized United States citizen:

a.     Electronic mail (email) account mjz20892@hotmail.com, and a SkyDrive remote computing account for user "ming zhang," both of which are subscribed to "ming zhang," and controlled and hosted by Microsoft, Inc., headquartered at One Microsoft Way in Redmond, Washington.

b.     Email account mingjie_zhang@yahoo.com, which is subscribed to "Mingjie_Zhang," and controlled and hosted by Yahoo! Inc., headquartered at 701 First Avenue in Sunnyvale, California. ZHANG is further associated with this email account through his listing of his FDA email account, ming.zhang@fda.hhs.gov, as an alternate email address.

c.     11710 Old Georgetown Road, #827, Rockville, MD, which is ZHANG's current residence.

3.     Based on the investigation to date, I believe there is probable cause to believe that the records associated with the above-referenced residence and email and remote computing

accounts contain evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1832 (theft of trade secrets), and 18 U.S.C. § 1831 (economic espionage). Accordingly, this application for search warrants seeks authorization to seize the records and other information and items as specified in Attachments A-C.

4.      I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. The information set forth in this affidavit is based on my own observations and review of documents, or reliable information provided to me by other law enforcement personnel. I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested search warrant. However, I have not omitted any fact which might tend to defeat a finding of probable cause. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

**Relevant Facts and Circumstances**

5.      Based on information provided to me by U.S. Food and Drug Administration (FDA) representatives, ZHANG is a full time Staff Scientist/Microbiologist at the Laboratory of Molecular Virology, which is a component of the FDA Center for Biologics and Evaluation Research (CBER) located in Rockville, Maryland. He has been employed with the FDA since April 14, 2002. According to the FDA website, the CBER regulates biological products for human use under applicable federal laws, including the Public Health Service Act and the Federal Food, Drug and Cosmetic Act. CBER's regulatory authority extends to blood, vaccines, allergenics, tissues, and cellular and gene therapies, and involves cutting-edge biomedical research for treatment of medical illnesses and conditions that presently have few or no other

2

treatment options.  CBER's review of new biological products, and for new indications for already approved products, requires evaluating scientific and clinical data submitted by manufacturers to determine whether the product meets CBER's standards for approval.  After a thorough assessment of the data, CBER makes a decision based on the risk-benefit for the intended population and the product's intended use.

6.     As an employee of the FDA, ZHANG is subject to internal security restrictions with respect to his workplace computer.  The FDA computer network security banner states the following:

> You are accessing a U.S. Government information system, which includes (1) this computer, (2) this computer network, (3) all computers connected to this network, and (4) all devices and storage media attached to this network or to a computer on this network. This information is provided for U.S. Government-authorized use only. Unauthorized or improper use of this system may result in disciplinary action, as well as civil and criminal penalties. By using this information system, you understand and consent to the following:
> You have no reasonable expectation of privacy regarding any communications or data transiting or stored on this information system. At any time, and for any lawful government purpose, the government may monitor, intercept, and search and seize any communication or data transiting or stored on this information system.
> Any communications or data transiting or stored on this information system may be disclosed or used for any lawful government purpose.

7.     According to information provided by FDA representatives, ZHANG is prohibited, as a condition of his FDA employment and per FDA policy, from owning a business, or being employed by an outside business, related to the biotechnology industry.  He also does not have permission to access the FDA computer network via a personal home computer, or any other computer outside of the FDA network, nor has he obtained permission to use any external media storage devices, such as a thumb-drive or other personal storage device, on his work laptop.

3

A.     **Siemens Proprietary Information**

8.     On or about November 23, 2012, according to information provided to me by FDA representatives, ZHANG triggered an internal security alert on his FDA work laptop for accessing "flow.backupfrid.net," a website used for on-line personal storage.   Upon further analysis by the FDA's Computer Security Incident Response Team (CSIRT), it was determined that "flow.backupgrid.net" was associated with JustCloud personal on-line storage.   JustCloud is a company based in the United Kingdom that provides web-based personal document storage to the general public through a system called "cloud syncing," which allows for designated files or folders to be automatically synced online for access from any outside network.

9.     CSIRT's forensic analysis revealed that ZHANG had configured the "My Documents" and "Desktop" folders on his FDA laptop so that the JustCloud service would automatically sync those folders into ZHANG's JustCloud on-line personal storage account.   The email address associated with that account was ZHANG's Microsoft email account, mjz20892@hotmail.com.   According to information provided to me by a representative of JustCloud, ZHANG had established an account with the company on March 3, 2012, via his email mjz20892@hotmail.com, for a free trial period.   However, he never subsequently subscribed to the service, and JustCloud was unable to locate any information backed into ZHANG's account.   However, CSIRT found that the JustCloud service had repeatedly attempted since November 23, 2012, to upload the marked folders on ZHANG's laptop into a JustCloud account.

10.     One of the documents in ZHANG's "Desktop" folder marked for synchronization into the JustCloud account was a PowerPoint presentation saved as "LMV-DETTD012612.ppt,"

4

with the title slide reading, "LMV-Regulatory Report, Ming Zhang, 01-26-2012." The PowerPoint contained information received by the FDA from Siemens, a global company based in Germany that provides in-vitro diagnostics and molecular testing systems to healthcare professionals to aid in detection and treatment of infectious diseases, such as HIV and hepatitis. Representatives of Siemens and the FDA have advised me that the data contained in this PowerPoint relates to Siemens' "TRUGENE HIV-1 Next-Generation Sequencing Assay" device. (I have been advised that an "assay" is a type of biological analysis.)

11.     Another document found in ZHANG's "Desktop" folder marked for JustCloud synochronization was a PowerPoint presentation with the title slide, "M, Ming Jie Zhang." This PowerPoint set forth reasons why "M" is "right for you," and that "M" includes viruses, such as HIV-1, that are inactivated under laboratory conditions. The last page of the PowerPoint, titled "My Plan," contained the following bullet statement: "Introduce M to Chinese Market."

12.     Both of the above-referenced PowerPoint presentations were shown to the FDA's Deputy Director of Communications, Development and Outreach, who determines how and when product information can be disclosed to the public. FDA representatives advised me that the Deputy Director determined, based on her experience, that the information contained in the first PowerPoint, titled "LMV-Regulatory Report Mingjie Zhang 01-26-2012," was likely a trade secret and confidential, as the information contained therein referenced next-generation sequencing assay of HIV mutations. Based on her review of information contained within the FDA network and a general Internet search, the Deputy Director was also reasonably certain that Siemens had not yet publicly released some of the information contained in the LMV-Regulatory Report. The Deputy Director was aware of an Internet article on www.prnewswire.com that

5

estimated, based on a recent article in *Genetic Engineering & Biotechnology News*, that "the next-generation sequencing market could reach approximately $1.5 billion in sales by 2014 with a broader picture putting the value closer to $3.6 billion."

13.     On January 17, 2012, a Siemens representative confirmed to me that the information contained in the LMV-Regulatory Report found in the PowerPoint presentation on ZHANG's FDA laptop involves a next generation product for a genotyping and sequencing assay used in testing of HIV mutations.  The same Siemens representative subsequently advised me that according to all of the departments involved in the product's manufacture, the information in the LMV-Regulatory Report is considered a trade secret, as it is highly sensitive cutting edge technology in the early stages of completion that has not yet been released to the public.  The Siemens representative indicated that if any of Siemens' competitors or other countries got their hands on the information, it would seriously compromise Siemen's ability to recognize any economic benefit with the product in the future, or recoup the time and expense already incurred on the project.

14.     Had ZHANG been able to successfully back-up both of the marked PowerPoint presentations into his JustCloud account, he would have been able to access the information from outside of the FDA network.  More significantly, had ZHANG allowed anyone else access to his JustCloud account, Siemens sensitive proprietary information would have been compromised to its economic detriment.

**B.     SkyDrive Remote Computing Records**

15.     The files retrieved by the FDA from ZHANG's work laptop indicate that he is also a frequent user of Microsoft's SkyDrive product, which allows him to easily upload

documents to the account from the FDA network. SkyDrive, which was previously known as Windows Live SkyDrive and Windows Live Folders, is a file hosting service that allows users, and others they designate, to upload and sync files to remote storage and then access them from a Web browser or their local device. As was the case with JustCloud, by uploading and syncing files to SkyDrive, ZHANG could allow individuals outside of the FDA network to access the uploaded files.

16.    FDA representatives have advised me that access to SkyDrive is blocked within the FDA network; however, there have been instances where employees have been able to access SkyDrive without triggering any security alerts. According to CSIRT, ZHANG has been accessing his SkyDrive account from the FDA network since approximately November 2011. In August 2012, ZHANG apparently encountered some difficulty in accessing SkyDrive and submitted a HelpDesk request that the FDA IT Security Monitoring section personnel reinstate his access. Though the request was denied, ZHANG was subsequently able to access the account despite the system block, and according to CSIRT accessed SkyDrive as recently as within the last few days.

17.    I have reviewed screenshots of ZHANG's FDA network activity provided to me by the FDA that shows him accessing the SkyDrive system with the user name "ming zhang." The screenshots indicate that ZHANG has more than twenty different folders in his SkyDrive account each containing numerous documents that appear to be related his work at the FDA, or containing information obtained from the FDA network. The naming conventions of the folders in question include, but are not limited to, the following: Anti-virus, Biotechnology, Cell Therapy, Diagnostics, Documents, Experiments, New Materials, Patents, Flu, mjbiotech, Rosson,

7

and Virogene.

18.     A review of the screenshots suggest that the folders contained in ZHANG's Skydrive account called "mjbiotech" and "Rosson" contain information related to outside business endeavors.[1]  For example:

    a.     On or about June 19, 2012, ZHANG received an email at mingjie_zhang@yahoo.com from support@godaddy.com with the following message: "Dear Mingjie Zhang, As part of a continuing effort to provide the highest quality service for our valued customers, your hosting account, rossonpharma.com, will be migrated to a new server in 24 hours." According to website www.lookchem.com, Rosson Biopharm Holding, Inc., has a listed point of contact identified as "Ming Zhang, telephone number 240-672-6148, url: www.rossonpharma.com," with a street address of 11710 Old Georgetown Rd, 837, Rockville, MD 20852, which is ZHANG's personal home address.

    b.     On or about July 29, 2011, ZHANG received an email allegedly sent by an individual named Jimin Gao.  This email was sent from the email address jimingao@yahoo.com to zhangm@rossonpharma.com, with a copy to ZHANG at mingjie_zhang@yahoo.com.  The message read: "Dear Brother Mingjie, Can you give me your telephone number or call me at 13695856313? Since I have potential collaboration in Wenzhou to discuss with you. Thanks and talk to you later, Jimin." Additional research by me revealed that Wenzhou is located in China.

19.     Documents residing in ZHANG's SkyDrive account, which would be accessible to both him and outside third parties through remote access, include the following:

---

[1]   Email addresses for "Rosson" and "mjbiotech" -- zhangm@rossonpharma.com  and info@mjbiotech.com – are listed as alternate email addresses in the records for ZHANG's Yahoo email account, along with a China-based email address, mjz20892@163.com.

a.      The file "LMV-DETTD012612.ppt" was located found in a folder named "CTE2012" on ZHANG's laptop.  A similar folder titled "HIV-CTE" was located in ZHANG's SkyDrive account.  Given that the LMV-DETTD012612 document contains information from Siemens that focuses on HIV-related testing, it is possible that the document may also reside in the "HIV-CTE" folder in the SkyDrive account; however, CSIRT was unable to confirm that in their forensic analysis.  The CTE2012 laptop folder was also found to contain a document named "Trugene.ppt."  The PowerPoint folder in ZHANG's SkyDrive account was found to contain a similarly-named file titled "2011-Trugene."  Trugene is the name of Siemens HIV-1 Genotyping Assay identified in the "LMV-DETTD012612" PowerPoint.

b.      Certain screenshots from ZHANG's FDA laptop indicate that he was working on a confidential document belonging to Gen-Probe Incorporated regarding its "Procleix Dengue Virus Assay."  ZHANG's SkyDrive account includes a document named "GeneProbe" saved under the Documents folder.  It is unknown whether this is the same confidential document found on ZHANG's laptop.  However, ZHANG has a folder on his FDA network named "14-GeneProbe-STN125113," which contains other documents and emails referencing Gen-Probe information.  ZHANG also has a folder on his SkyDrive account titled "Dengue."  Based on my review of additional screenshots from ZHANG's laptop, it appears that the Procleix information is non-public information submitted to the FDA by Gen-Probe for evaluation.

c.      Other screenshots from ZHANG's laptop indicate that on or about May 23, 2012, he uploaded a document called "AGHIV spec sheets" from his H drive on the FDA network to his SkyDrive account, and renamed it "Antigens used by Calypte in Aware."  This

document was originally saved on ZHANG's H drive under the folder pathway "Regulatory\Reviewed2008-\18-Calypte-IDE 14909 Aware 2\Submission\040212." The "IDE" abbreviation in this pathway stands for Investigational Device Exemption, which falls within the restrictions set forth in 21 C.F.R. § 812.38. This section states, in pertinent part, that the FDA

> will not disclose the existence of an IDE unless its existence has previously been publicly disclosed or acknowledged, until FDA approves an application for premarket approval of the device subject to the IDE; or a notice of completion of a product development protocol for the device has become effective.

According to the FDA, the document that ZHANG uploaded into his SkyDrive account titled "AGHIV Spec Sheets" deals with Calypte Biomedical Corporation's HIV Antibody Testing that was submitted to the FDA for investigational purposes. The FDA has advised me further that most all information that falls under an IDE submission is considered confidential or proprietary to the private company that submitted it to the FDA.

**C.     Email Activity Involving Outside Biotechnology-Related Business**

20.     Email messages stored on ZHANG's FDA work computer indicate that ZHANG has had ongoing business-related email contact with individuals whose email addresses originate in China. On August 29, 2012, a Chinese linguist with the FBI completed a summary translation of numerous emails between ZHANG's personal email account, mingjie_zhang@yahoo.com, and multiple China based email addresses. The following are a few examples of those email messages and related activities:

a.     In an email thread dated on or about May 20, 2012, ZHANG and an individual identified as Li Yuan (LI), at China-based email address dalianliyuan@yahoo.com.cn, engaged in a lengthy discussion regarding start-up of a business involving health-related products.  According to the summary translation prepared by the FBI linguist, Li advised

10

ZHANG that the company was going to be registered under the names of Li and another individual, Zhao Jinli, because a third individual, Shi Changhong (Shi), could not participate in the registration as a member of the military. Li went on to advise that following the registration, both ZHANG and Shi would be added to the company, and asked ZHANG to think about how the company agreement should be worded. Li recommended that the company's first project involve health products for lowering blood pressure, and the second project an antibody identified as CD47, assuming certain experimental results confirmed it could be done. Li stated that the company should be able to start expression and purification work in a month, though Li was uncertain if the CD47 had been acquired. Later in the continuing email thread, Li advised ZHANG of his desire to obtain investment support from the government [presumably the Chinese government] by participating in a proposal to promote the development of Shaanxi Province's health production chain put forth by an individual with the provincial Food and Drug Administration and the President of the Academy of Traditional Chinese Medicine.

b.      On or about June 20, 2012, ZHANG sent an email to adennis@mdanderson.org in which he stated, "Dear Mr. Dennis: We are a biotech company in China, interested in the K562IL21 cell based NK cell expansion." A Google search of "NK Cells" revealed that NK stands for Natural Killer cells which are a lymphocyte that play a major role in the host rejection of both tumors and virally infected cells. FDA representatives have advised me that ZHANG does currently work on NK cell projects at the FDA. (The "biotech company" referenced by ZHANG is unknown at this time.)

c.      On or about July 27, 2012, ZHANG received an email from paul.xu@excellgen.com. The email requested that ZHANG purchase products "37276 Talen

11

plasmid," "37275 Talen plasmid" and "TALENkit" via the website www.addgene.org. (I have been advised that "talens" are biologic materials used in genome editing and other gene and biologic research.) The author of the email, identified as "Paul," subsequently sent a follow-up email to ZHANG on or about August 6, 2012, with the same information in the body of the email with the addition of what appeared to be a MasterCard credit card number and expiration date.

d.      Screenshots on ZHANG's FDA laptop indicate that on or about August 6, 2012, ZHANG logged into www.addgene.org from his FDA laptop and ordered the items requested by Paul. The combined charge for all three products was $430.00 plus shipping of $80.00 for a total of $510.00. The subsequent screenshots indicate ZHANG was purchasing the products on behalf of the laboratory of "Ming Zhang at US FDA, Center for Biologics Evaluation and Research (CBER)." He accepted the "Terms of Purchase," which included language that "your institution must first agree to and accept the applicable Material Transfer Agreement prior to distribution of your order." ZHANG then entered the MasterCard number and expiration date provided by Paul, along with a security code number. ZHANG checked a box for the item to be shipped to "Mingjie Zhang, FDA, 8800 Rockville Pike, Building 29B, Room 3G01, Bethesda, MD 20892," and checked the billing address box which included "na" as the answer for the person and address. ZHANG also clicked a box to agree to the terms of the recipient scientist agreement on the next page, which stated "Recipient Scientist also certifies that he or she will be using the plasmids in a certified biology research environment, at the academic or non-profit institution U.S. FDA Center for Biologics Evaluation and Research (CBER)." ZHANG then submitted the request to complete the transaction and subsequently received an order confirmation at his Yahoo email account.

12

e.      According to the Articles of Incorporation for Excellgen, Inc., the company was incorporated on January 22, 2008, and is owned by Paul Xu.  The listed mailing address is 15601 Crabbs Branch Way, Room W204, Rockville, MD 20855.  Exellgen has an established operating website named www.excellgen.com, which provides a retail environment for selling stem cell reagents, other miscellaneous biological materials and offers services such as Custom Cloning, Protein Expression and Genome Engineering.  The FDA has advised me that the agency does not have a relationship, contractual or otherwise, with Paul Xu or Excellgen.  In addition, ZHANG is not authorized to purchase biologics or other items on behalf of the FDA or in connection with his employment through third party credit cards, or to purchase such items on behalf of an outside third party.

f.      On or about November 5, 2012, ZHANG received an email from Paul (at paul.xu@excellgen.com) with a forwarded message from an individual named "Young Kim," whose title was listed as Associate Technical Support Manager for System Biosciences in Mountain View, California.  The body of the forwarded email pertained to Paul's interest in the company's "Piggybac HR donor vector for use with TALEN pairs."  Young Kim explained that the current HR donor vector was "undergoing testing in the lab to ensure complete functionality and sequence validation that could take up to 2 weeks for full completion for release to the research community."  Young Kim stated further that due to Paul's interest in the vector prior to its release, he was attaching a draft protocol for Paul's review.  Young Kim asked that Paul keep the document private and not release it to the general public, since it was not officially launched to the research community.  Later that day, Paul sent another email to ZHANG listing three different TALENs, asking "which one is good for TALEN," and requesting that ZHANG buy

13

seven different vectors and list them.

g.     On or about November 25, 2012, Paul sent ZHANG another email with the subject line "addgene," and listed the following: "26745: pDIRE, 32702: pMSCV, Plasmid 18723: CMV-Brainbow-2.1 R, and Plasmid 16666: pGRG36." On or about December 5, 2012, ZHANG logged into www.addgene.org from his FDA laptop and ordered the four items identified by Paul for a total amount of $260.00 in products and $20.00 in shipping.  ZHANG used the same MasterCard number previously provided by Paul; however, he did not complete the transaction.

h.     On or about December 6, 2012, Paul sent ZHANG two emails: the first provided the following information, "discover 6011398525798668, 03/14, 16224 Orchard view Ct., Gaithersburg, MD 20878;" and the second stated "amex, 372738187331009, 12/15." Thereafter, ZHANG logged back into www.addgene.org from his FDA laptop and input the above Amex card number, expiration date and a security code, along with the address Paul had provided for billing.  ZHANG then used the same FDA shipping address he had previously provided in the August 2012 transaction referenced above, accepted the Recipient Scientist Acknowledgement, and submitted the order.  He subsequently received an order confirmation at his Yahoo email account.[2]

i.     On or about February 12, 2013, ZHANG sent an email to an individual named Benito Novas at bnovas@regenstem.com.  In his message, ZHANG indicated that he was in Maryland, was interested in buying an "Adi-Light2," and wanted a price quote for the product.

---

[2]  In addition to the fact that ZHANG is prohibited by the FDA from ordering products on behalf of an outside third party, it appears from information on the Addgene website that some of the products ZHANG ordered for Paul are restricted from sale to third parties and are only to be used for internal academic research.

Novas sent a reply email asking ZHANG for information about his company, the intended use of the requested product, and whether ZHANG required training on the product. ZHANG replied, "We are in the process to set up a company here in Maryland for stem cell research and we are also planning to set up a company in China and Southeast Asia for stem cell therapy." ZHANG requested prices for all of the company's products, and inquired if they could be sent overseas. Novas replied stating that his company could ship products outside of the U.S., and he included a price list for twelve different biotech products, including items such as cell separator and a stem cell kit priced in amounts of approximately $1,000 or more. The CSIRT forensic analysis indicates that during this email thread, ZHANG was creating a shopping list of supplies in a separate Microsoft Word document, which he then saved to his SkyDrive account under a folder named "Cell Therapy."

21.     CSIRT located a number of email addresses on ZHANG's FDA laptop during their forensic review. These email addresses included zhangm@rossonpharma.com referenced above, as well as the email account ming.z@excellgen.com that appears to be associated with Paul Xu's company Excellgen. Other email addresses identified on ZHANG's laptop included zhang@jasonmedical.com and zhangm@virogenes.com. A review of Articles of Incorporation for the two companies referenced in these last two email addresses revealed that the companies were formed by ZHANG in or about 2007 and then forfeited approximately one year later. Additionally, according to the website for Jason Medical which is in Chinese characters, the address at the bottom of the website provides the address of record as 10075 Tyler Court 17, Ijamsville, MD 21754. A LexisNexis search indicates that ZHANG was the listed registered agent for Jason Medical. A review of Maryland State Department of Assessments and Taxation

15

records revealed that ZHANG incorporated Jason Medical at the above address on or about August 7, 2007, and the company was then forfeited on or about October 2, 2009.

**D.     External Media Devices Used by ZHANG**

22.     A large number of documents residing on ZHANG's FDA laptop were also discovered by CSIRT to reside on a non-FDA, USB-removable external media device. This external media device was not approved by the FDA for ZHANG's use in the FDA computer network.  According to the FDA, ZHANG has never been assigned an approved FDA "Iron-Key," which is an external media device approved for use on the FDA network.  During their forensic analysis, CSIRT was able to identify that a generic USB device had most recently been attached to ZHANG's FDA laptop on December 27, 2012 at about 3:12PM.

23.     One of the documents apparently transferred onto ZHANG's personal external media device was a file named "LMV-DETTD012612.ppt" containing information about the Siemens device referenced herein.  CSIRT also identified that a document named "DRACO.ppt" was located on both ZHANG's generic electronic media device and in his SkyDrive account (under the folder pathway called Antiviral/DRACO.)   This PowerPoint focuses on FADD proteins, FADD sequencing and RNA or ribonucleic acid detection. Other documents found on both the generic drive and SkyDrive include documents titled "In Cell ELISA.doc," "26p.doc," "A protocol for rapid generation of recombinant.pdf," and "Plasmonic ELISA."   Additional details about these documents could not be determined, since ZHANG had failed to open them within the screenshots captured by CSIRT.

24.     On March 7, 2012, ZHANG submitted a Helpdesk request to have FDA desktop support personnel install an FDA VPN (Virtual Private Network) software client connecting

16

ZHANG to the National Institutes of Health (NIH) network on his personal home computer. The request was denied by FDA as it violates FDA IT Security policy. Although no other details were provided by ZHANG as the basis for his request, the FDA advised me that other FDA scientists have requested similar access solely for access to the NIH library via their FDA computers. ZHANG's request was denied because he wanted the VPN access to the NIH library via his personal laptop, which would give him access to documents that are not available to the general public on a non-FDA computer.

**E.     Evidence Found in Computers and Documents**

25.    Based on my knowledge, training, experience, and participation in other investigations, and information provided by other law enforcement officers, I know that:

a.     Owners and operators of businesses, including self-employed individuals, are required to maintain files in accordance with state and federal regulations regarding the financial operations of the business. Corporations and Limited Liability Companies (LLCs) are required to maintain financial statements and records on all company activities. Due to federal income tax laws, owners and operators of businesses maintain their books and records for many years.

b.     Items maintained by the owner/operator of a business include ledger books, telephone books, receipts, customer lists, financial statements, banking receipts and statements, legal documents, copies of filings, and correspondences, which are typically stored in both hard copy and electronic media, such as computers, personal data assistants (PDAs), external media and other electronic devices. These documents and files can identify associates and their participation and role in both the legal entity and any illegal activities of such businesses. Financial statements and loan applications often are more accurate than a criminal's filed income tax returns.

c.     Individuals who amass proceeds from their illicit activities routinely attempt to conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, and wire transfers, which are also routinely maintained at the individual's residence, place of business, in computers or other electronic media, or on other properties under the individual's control. Home computers are often used by business owners to keep track of business expenses and income. Many times, documents, materials, statements, or instrumentalities of an

17

illegal nature are typically stored in safes within a residence to safeguard and facilitate their concealment.

26.     My knowledge, training and experience, has also taught me that searching and

seizing information from computers often requires seizure of most, if not all, electronic storage

devices (along with related peripherals) for a later search by a qualified computer expert in a

laboratory or other controlled environment.  This is true because of the following:

a.      Computer files, or remnants of such files, can be recovered months or years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost, and if deleted, can be recovered using readily-available forensics tools.  When a person "deletes" a file on a computer, the data contained in the file does not actually disappear, but instead, remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

b.      Computer storage devices (like hard disks, diskettes, thumb-drives, tapes, laser disks) can store the equivalent of millions of pieces of information.  A suspect may try to conceal criminal evidence by storing it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime.  This sorting process can take weeks or months depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.  Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence

18

is vulnerable to inadvertent or intentional modification or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the systems data in a laboratory or other controlled environment.

**F.   Conclusion**

27.   I know from my experience working within the FBI Baltimore Counterintelligence Division that China, Russia, and a number of other countries have long sought to acquire U.S. advanced technology for their own economic gain. This conduct has been the ongoing focus of recent law enforcement efforts to curb unlawful exports of U.S. technology and other items to China and other countries. China, for example, has repeatedly sought to obtain U.S. intellectual property or proprietary information through Chinese nationals or other individuals working here in the U.S. who have access to such information.

28.   ZHANG's activities seem to be directly related to more recent efforts by the Chinese to acquire information about patented drugs for the purpose of producing generic copies at lesser cost for distribution in the open market. This focus has been the subject of public reporting. For example, in July 2011, the website www.rsc.org, also known as Chemistry World, published an article discussing how China had loosened its drug licensing laws to allow its pharmaceutical companies to produce cheap generic copies of patented drugs under certain circumstances. The article went on to state that "HIV drugs may be the first target [of the new licensing changes], as HIV has become a growing threat in China, especially in rural areas where drugs are in extremely short supply." ZHANG works on HIV-related treatments and devices at the FDA and, as evidenced herein, has had email contact on this subject matter with individuals

in outside biotech companies. He has repeatedly uploaded, or attempted to upload, sensitive documents on HIV and other biotech matters into remote storage accounts that can be accessed by third parties with his permission. He is also, or has been, involved in numerous outside business ventures in contravention of FDA policies and procedures.

29.     All of this activity evidences probable cause to believe that ZHANG is communicating with individuals overseas and taking other steps to develop a business in which his employment at the FDA and his access to multiple private U.S. company research material can be, and is being, exploited to potentially create a revenue stream, possibly in China or elsewhere. By uploading non-public, sensitive proprietary information into remote computing services or on his own personal external media devices, ZHANG has the ability to enable himself and others outside of the FDA network to have access to that information to the potential economic detriment of its owners.

30.     For these reasons, there is probable cause to believe that within the accounts referenced herein and ZHANG's residence are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1832 (theft of trade secrets) and 18 U.S.C. § 1831 (economic espionage). The instant warrant application is governed by 18 U.S.C. § 2703(a), which permits governmental entities to require disclosure of the contents of stored electronic communications pursuant to a search warrant. Section 2703(a) further provides that such a warrant may be issued "by a court with jurisdiction over the offense under investigation." Moreover, §§ 2703(c)(1)(A) and (c)(2), provide that, in addition to the contents of electronic communications, the government may obtain by means of a search warrant any remaining types of records and information, such as computer logs and subscriber information, pertaining to a subscriber of an

20

electronic communication service or remote computing service. Section 2703(c)(3) provides further that under such circumstances, no notice to the subscriber or customer is required.

31.     Every attempt will be made to do on-site searching and copying of the computer hardware recovered pursuant to the warrant for ZHANG's residence. However, in light of the issues enumerated above, it is requested that the Court permit seizure of the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and conduct an off-site search of the hardware for relevant evidence, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

32.     In order to ensure that agents search only those computer accounts and/or files described in the relevant Attachments, this affidavit and application for a search warrant seeks authorization to permit employees of identified Internet Hosting Providers to assist agents in the execution of this warrant. To further ensure that agents executing this warrant search only those computer accounts and/or files described in the relevant Attachments, the following procedures will be implemented:

a.     The agent executing the warrant shall effect service by any lawful method, including faxing the warrant (with the Internet Hosting Provider's consent) to the offices of the Internet Hosting Provider at the locations specified in the warrant. Internet Hosting Provider personnel will be directed to isolate the account and files described in the relevant Attachments.

b.     In order to minimize the disruption of computer service to innocent third parties, Internet Hosting Provider employees trained in the operation of computers will create an exact duplicate of the computer accounts and files described in the relevant Attachments,

21

**13-0315TJS** thru **13-0317TJS**

including an exact duplicate of all information stored in the computer account and files described in the relevant Attachments.

        c.      Internet Hosting Provider employees will provide the exact duplicate in electronic form of the accounts and files described in the relevant Attachments and all information stored in that account and files to the agent who serves this search warrant.

        d.      Upon receipt of this information, (and the electronic media seized from ZHANG's residence), the search procedures outlined in Attachment D will be utilized to minimize, to the greatest extent possible, the likelihood that files or other information for which there is not probable cause to search are viewed.

Your affiant has signed this document under oath as to all assertions and allegations contained herein and states that its contents are true and correct to the best of her knowledge.

Brandon Ridenhour, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me on this ___15th___ day of February 2013.

Timothy J. Sullivan
United States Magistrate Judge

22

**13-0315TJS** thru **13-0317TJS**

## ATTACHMENT A

### I.    Search Procedure for Email Accounts Hosted by Microsoft

1.    The search warrant will be presented to the Internet Hosting Provider ("IHP") and its personnel, who will be directed to isolate those accounts and files described in Section II below;

2.    In order to minimize any disruption of computer service to innocent third parties, the IHP employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein;

3.    The IHP employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant; and

4.    Law enforcement personnel will thereafter, using procedures described in Attachment B of the Affidavit in Support of Search Warrant, review all information and records received from the IHP employees to determine the information to be seized by law enforcement personnel specified in Section III of Attachment A.

### II.    Files and Accounts to be Copied by the IHP Employees

1.    All electronic mail stored and presently contained in, or on behalf of, the following electronic mail address or individual account from January 01, 2011 to the present: mjz20892@hotmail.com and SkyDrive account for user "ming zhang."

2.    All existing printouts from original storage of all of the electronic mail described above in Section II (1);

3.    All "address books" or other list of correspondents associated with account described above in Section II (1).

4.    All saved "chat" transcripts associated with account described above in Section II (1).

5.    All transactional information of all activity of the electronic mail address and/or individual account described above in Section II(1), including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

6.    All business records and subscriber information, in any form kept, pertaining to the electronic mail address and/or individual account described above in Section II(1), including

1

applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records; and

7.     All records indicating the services available to subscribers of the electronic mail address and/or individual account described above in Section II(1).

## III.   Information to be Seized by Law Enforcement Personnel

1.     All electronic mail and files which are evidence, fruits, and instrumentalities of 18 U.S.C. § 1832 (theft of trade secrets) and 18 U.S.C. § 1831 (economic espionage), including:

a.     All electronic mail and files that identify individuals directing, assisting, enabling, or otherwise involved in, violations of 18 U.S.C. §§ 1832 and 1831.

b.     All electronic mail and files that evidence or identify the means and methods utilized to commit or attempt to commit violations of 18 U.S.C. §§ 1832 and 1831.

c.     All electronic mail and files that evidence or identify payments and the means of payment or other types of compensation associated with violations of 18 U.S.C. §§ 1832 and 1831.

d.     All electronic mail and files that evidence or identify actions taken to direct, assist, enable, or execute violations of 18 U.S.C. §§ 1832 and 1831.

e.     All existing printouts from original storage which concern the categories identified in this section.

f.     All of the records and information described above in Sections II(3), (4), (5), (6) and (7).

2.     All "address books" or other list of correspondents.

3.     All saved "chat" transcripts that identify or otherwise involve conduct described in sections (a) through (d).

**13-0315TJS** thru   **13-0317TJS**

## ATTACHMENT B

**I.     Search Procedure for Email Accounts Hosted by Yahoo!**

1.     The search warrant will be presented to the Internet Hosting Provider ("IHP") and its personnel, who will be directed to isolate those accounts and files described in Section II below;

2.     In order to minimize any disruption of computer service to innocent third parties, the IHP employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein;

3.     The IHP employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant; and

4.     Law enforcement personnel will thereafter, using procedures described in Attachment B of the Affidavit in Support of Search Warrant, review all information and records received from the IHP employees to determine the information to be seized by law enforcement personnel specified in Section III of Attachment A.

**II.     Files and Accounts to be Copied by the IHP Employees**

1.     All electronic mail stored and presently contained in, or on behalf of, the following electronic mail address or individual account from January 01, 2011 to the present: mingjie_zhang@yahoo.com.

2.     All existing printouts from original storage of all of the electronic mail described above in Section II (1);

3.     All "address books" or other list of correspondents associated with account described above in Section II (1).

4.     All saved "chat" transcripts associated with account described above in Section II (1).

5.     All transactional information of all activity of the electronic mail address and/or individual account described above in Section II(1), including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

6.     All business records and subscriber information, in any form kept, pertaining to the electronic mail address and/or individual account described above in Section II(1), including

1

applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records; and

      7.     All records indicating the services available to subscribers of the electronic mail address and/or individual account described above in Section II(1).

## III.    Information to be Seized by Law Enforcement Personnel

      1.     All electronic mail and files which are evidence, fruits, and instrumentalities of 18 U.S.C. § 1832 (theft of trade secrets) and 18 U.S.C. § 1831 (economic espionage), including:

            a.     All electronic mail and files that identify individuals directing, assisting, enabling, or otherwise involved in, violations of 18 U.S.C. §§ 1832 and 1831.

            b.     All electronic mail and files that evidence or identify the means and methods utilized to commit or attempt to commit violations of 18 U.S.C. §§ 1832 and 1831.

            c.     All electronic mail and files that evidence or identify payments and the means of payment or other types of compensation associated with violations of 18 U.S.C. §§ 1832 and 1831.

            d.     All electronic mail and files that evidence or identify actions taken to direct, assist, enable, or execute violations of 18 U.S.C. §§ 1832 and 1831.

            e.     All existing printouts from original storage which concern the categories identified in this section.

            f.     All of the records and information described above in Sections II(3), (4), (5), (6) and (7).

      2.     All "address books" or other list of correspondents.

      3.     All saved "chat" transcripts that identify or otherwise involve conduct described in sections (a) through (d).

**13-0315TJS** *thru* **13-0317TJS**

## ATTACHMENT C

The following items constituting evidence, fruits and instrumentalities of theft of trade secrets in violation of 18 U.S.C. § 1832, and economic espionage in violation of 18 U.S.C. § 1831, to be seized from 11710 Old Georgetown Road, #827, Rockville, MD, more particularly described as a condominium in a high-rise, multi-level, two tower secured condominium complex marked with the numbers "11710" and located near the corner of Highway 355/ Rockville Pike and Old Georgetown Road; #827 is located on the eighth floor of the condominium tower seen on the left as one is facing the complex.

All records relating to business transactions or business-related communications with United States or foreign entities, nationals or businesses involved in biotechnology research, development or production, and all records relating to sharing of biomedical research and development information and documents proprietary to the FDA and U.S. manufacturers and distributors, to include the following records and email maintained both electronically and otherwise:

1.    Documents, including financial records, correspondence, incorporation articles, website information, and other items evidencing ownership or involvement in outside biotechnology businesses or related pursuits.

2.    Copies of travel records and related correspondence evidencing travel to/from the United States and payment for such travel.

3.    Technical documents, presentations, specifications, correspondence related thereto, and other material or documents containing information proprietary to the FDA or United States companies.

4.    Copies of invoices, shipping documents, related correspondence, and business cards.

5.    Computer records referring or relating to the information sought in paragraphs 1 through 4 above, including but not limited to: computers; central processing units; external and internal drives; external and internal storage equipment or media; terminal or video display units; computer software; computerized storage devices, including data stored in zip drives, and any such device's power supply hardware; account names; passwords, encryption codes; computer printouts or computer programs; and computer or data processing software or data, including CD-ROMs, hard disks, and floppy disks.

1

**13-0315TJS** *thru* **13-0317TJS**

## ATTACHMENT D

### Description of Methods to be Used for Searching Computer-Related Items

This warrant authorizes the search of electronically stored information. Because of the possibility that the files provided in response to this warrant will include information that is beyond the scope of what the United States has demonstrated the existence of probable cause to search for, the search shall be conducted in a manner that will minimize, to the greatest extent possible, the likelihood that files or other information for which there is not probable cause to search are viewed.

With respect to the search of any digitally/electronically stored information seized pursuant to the instant warrant as described in Attachment A hereto, the search procedure may the following techniques listed below. This list is a non-exclusive list which illustrates the types of search methodology that may avoid an overbroad search. The government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth in Attachments A, B and C:

a.      examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized;

c.      physical examination of the storage device, including surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized;

d.      opening or reading portions of files in order to determine whether their contents fall within the items to be seized;

e.      scanning storage areas to discover data falling within the list of items to be seized, to possibly recover any such deleted data, and to search for and recover files falling within the list of items to be seized; and/or

f.      performing key word searches through all electronic storage areas to determine whether occurrence of language contained in such storage areas exist that are likely to appear in the evidence to be seized.

1